## ADKINS v. ATLANTA & CHARLOTTE AIRLINE RAILWAY COMPANY.

1. A brakeman voluntarily transferred from a freight train to work the hand-brakes of a passenger train, whose air-brakes were out of order, and whose platforms were slippery with ice, but with skilled officers and employees in charge, was thrown or fell from the train while in motion and was killed. *Held*, that the railroad company was guilty of no negligence.

2. Failure of the engineer to blow on brakes would not render the railroad company liable for an injury which was not the result of such failure.

3. Section 1525 of General Statutes requires a railroad company to give immediate notice of accidents attended with injury to person, to the nearest physician and to the railroad commissioners, and prescribes a forfeiture for failure to do so, but does not declare by whom recoverable. Has this section any application to an action brought by a person so injured or his administrator to recover damages for such injury?

4. A brakeman, seen on the train after leaving a station, was missed at the next stopping point, but supposed to be on the engine. When it was learned that he was not there, the conductor telegraphed inquiries to the station where the absent brakeman was first missed, and to headquarters, and inquiries were made along the line on the return trip. *Held*, that it was not the duty of the railroad company to institute search for the brakeman's body along the line of its track.

Before HUDSON, J., York, April, 1886.

The opinion states the case.

*Mr. S. P. Hamilton*, for appellant.

*Messrs. Duncan & Sanders*, contra.

June 29, 1887. The opinion of the court was delivered by

MR. JUSTICE McIVER. This was an action brought by the plaintiff, as administratrix of Oliver Adkins, deceased, to recover damages for the injury sustained by her as the wife of the deceased and by his father by reason of his death, caused, as alleged, by the negligence of the defendant company.

The testimony shows that the plaintiff's intestate was in the

employ of defendant as brakeman on a freight train, and that on the evening of January 9, 1884, he, with two others, were detailed to take out a special passenger train from Charlotte to Atlanta, under the direction of a conductor by the name of Holt. This train, it seems, was some five hours behind its schedule time in reaching Charlotte, and though supplied with air-brakes, the same were not in working order, and hence it became necessary to use the hand-brakes, to which duty the deceased and one Jarrott, with whom he had been working as fellow-brakeman on the freight train, were assigned. The night was excessively cold, with continued falls of snow, by which the platforms of the cars were covered with ice and made very slippery. The train proceeded without accident or trouble, except that some ineffectual attempts were made to use the air-brakes, which, however, were finally abandoned at Seneca, from which point reliance was placed solely on the hand-brakes.

The deceased was last seen very soon after leaving Westminster, but it did not appear that he was missed until the train reached Tacoa,[1] where some search and inquiry was made for him in the baggage car, where he ought to have been, by his fellow-brakeman Jarrott, who, however, thinking that he had gone forward to ride on the engine, as the train hands sometimes did, made no further search, and said nothing about his disappearance. But when the train reached Gainesville and it had been ascertained that the deceased was not on the train, the conductor telegraphed to Tacoa to inquire about him, and also to headquarters in Atlanta reporting his disappearance. Not being able to learn anything of him, they renewed their inquiries along the road as they returned that evening from Atlanta, but still were unable to hear anything of him. Nothing was heard of the deceased until a few days afterwards—the Circuit Judge saying it was on January 12, while counsel for appellant contends it was on the 15th—when his dead body was found lying in a ditch near the railroad track at a point near the 104 mile post.

It seems that at or near this point there is a steep grade and a reverse curve in the railroad track, in passing which the deceased was thrown or fell from the train. The body, when found,

---

[1] The train did not stop between Westminster and Tacoa.—REPORTER.

was frozen stiff, as well as the clothes in which the deceased was dressed, but his hat was found at some little distance from the point where the body was found at an embankment, and his clothes and shoes were covered with "shining mica sand," similar to that found in the embankment. The body presented no external marks of injury, except a bruise or cut over the right eye, and there was no evidence that any of his bones were broken, though it does not appear that any examination, except of the most casual character, was made. The hands were clutched, as if grasping something, "and were muddy with shining dirt." The body was found by the section master of the railroad in charge of that part of the line, and his hands, and after being dressed in a new suit of clothes, bought from a neighboring store, and paid for by the railway company, was sent to Charlotte, and thereafter being provided with a suitable coffin, forwarded to Chester for interment.

At the close of the plaintiff's testimony the defendant moved for a non-suit, which was granted, upon the ground that the plaintiff had failed to adduce any evidence tending to establish the charge of negligence. From this judgment the plaintiff appeals upon the several grounds set out in the record, which need not be repeated here, as the sole question for us to consider is whether the Circuit Judge erred in holding that there was no evidence tending to establish the charge of negligence. The negligence imputed to the defendant by the appellant is of two kinds: First, in causing the disaster by negligent conduct of their agents. Second. Negligence in not ascertaining more promptly the condition of the deceased after the disaster occurred, and contributing to his relief.

We have examined the testimony carefully, and are unable to discover the slightest evidence of any negligence on the part of the railway company, or any of its employees, which could by any possibility have contributed towards causing the disaster complained of. There is no testimony tending to show that there was any want of skill or care on the part of the conductor, the engineer, or any of the other employees, in the management of the train, unless it be on the part of the deceased himself, who, when rebuked by the conductor for not putting on the brake,

with which he was charged, just before reaching Westminster, whereby the train ran past that station before stopping, and accused of being asleep, made no denial or reply. But even this occurred before the accident happened, and could not have had any agency in causing it. The fact that the air brakes were not in working order, and the ineffectual attempts to use them, cannot possibly be regarded as negligence contributing to the injury, for the very fact that the air-brakes were out of order was the only reason why the deceased and his fellow-brakeman, Jarrott, were put upon the train; and the undisputed testimony from the plaintiff's own witness was, that the attempts to use the air-brakes ceased at Seneca before the train reached the point where the accident occurred.

The fact that the deceased was transferred from his post as brakeman on a freight train to a similar position on a passenger train, cannot help the plaintiff, for all the witnesses examined as to this point concur in saying that the former position was more dangerous than the latter; and the facts which they state, that the brake on a freight train is operated from the top of the cars, where there is no railing or other protection to the brakeman to keep him from falling, or being thrown off by the motion of the train, while the brake on a passenger train is operated from the platform of the car, where there is a railing which serves as such protection, conclusively show that the witnesses were right in saying that the post to which the deceased was transferred was not only not more, but actually less dangerous than the position for which he was regularly employed. But in addition to this the plaintiff's own testimony not only shows that the deceased voluntarily assumed the duty of brakeman on this train, but that he was anxious to do so; for there was not only the testimony of both Jarrott and Price that the deceased seemed to be anxious to go as brakeman on the train, which is objected to in the argument as merely the opinions of these witnesses, but there was also this distinct statement by the witness Price, in speaking of the deceased: "I heard him say he was glad to get to go out, as he hadn't been making very much that week, and we were all glad to make a run of that kind"—giving as a reason that they were paid by the run.

The fact that the platforms of the cars were slippery on account of the ice found upon them, cannot be imputed as negligence to the company which would make it liable for the disaster which occurred, for that was a defect or peril which was perfectly obvious to the senses, the hazards from which the deceased voluntarily assumed. As was said in *Hooper* v. *C & G. Railroad Company* (21 *S. C.*, at page 547), adopting the language of Pierce in his work on railroads: "A servant who, before the injury, had knowledge of the defect in the road or machinery, or who, having a reasonable opportunity to inform himself, ought to have known such defects, is presumed, by remaining in the company's service, to have assumed the risks of such voluntary exposure of himself, and cannot recover for an injury resulting therefrom. * * * This rule applies with special force where the defect or danger is obvious to the senses." Now, certainly the slippery condition of the platform was perfectly obvious to the senses, and the deceased must necessarily be regarded as having voluntarily assumed the risk incident thereto.

Again, it is urged that the failure of the engineer to give the signal to put on the brakes at Chaugee Hill was such negligence as would make the company liable. In the first place, there is no evidence that the engineer failed to give the signal. The most that can be said is, that the witnesses examined as to this point could not say whether the signal was given or not. In addition to this, it is difficult to conceive what agency the failure to give the signal could possibly have in producing the kind of accident which actually occurred. On the contrary, it would seem that the failure to "blow on brakes" would have induced the deceased to have remained in the baggage car, where he would have been safe from the disaster which actually did happen; for if he had remained in the baggage car, he could not possibly have been thrown or have fallen from the platform outside, as it is assumed, and very properly assumed, he must have done. So that even if there were any evidence (although we have not been able to discover any), that the engineer neglected to give the signal for "down brakes," this would not make the company liable for the disaster which actually did occur, as there could be no possible connection between the negligence proved and the injury sus-

tained. For, as was held in *Glenn* v. *C. & G. R. R. Co.* (21 *S. C.*, 466), to recover damages for an injury done to a party by another, the plaintiff must not only produce evidence of negligence by such other, but also that the injury complained of was the result of such negligence. Now, if it had appeared that by reason of the failure of the engineer to give the proper signal to put down the brakes, the train had run down the steep grade and around the curves at such an undue rate of speed as to throw the train from the track, whereby the deceased was injured or killed, then that would have been a case in which the injury actually sustained could have been referred to the negligence proved. But in this case, even assuming for the sake of the argument that the engineer failed to give the proper signal, we are unable to perceive any possible connection between such negligence and the disaster which actually occurred. In addition to all this, the testimony shows that the deceased was distinctly instructed by his more experienced fellow-brakeman, Jarrott, when to put on the brakes on Chaugee Hill, and that certainly was more effective than a signal by the blowing of a whistle.

As we have said, we are unable to discover any evidence whatever tending to show any negligence which could have possibly had any agency in causing the disaster complained of.

Our next inquiry is, whether there was any evidence of negligence on the part of the company or its agents in making proper efforts to find the deceased after the disaster occurred and in administering to his relief. On this branch of the case the counsel for appellant relies upon the provisions of section 1525 of General Statutes, which reads as follows: "Every railroad corporation shall cause immediate notice of any accident which may occur on its road attended with injury to any person to be given to a physician most accessible to the place of accident, and shall also give notice within twenty-four hours to the railroad commissioners of any such accident, or of any accident falling within a description of accidents, of which said commissioners may, by general regulation, require notice to be given. For each omission to give such notice the corporation shall forfeit a sum not exceeding one hundred dollars."

It will be observed that a specific penalty for a failure to com-

ply with the provisions of this section is prescribed, but by whom to be recovered—whether by the State, the railroad commissioners, or by the party injured—is not stated; and therefore it might be a question whether this section has any application to a case like the present, where the action is for damages. But waiving this, inasmuch as the question was not made in this case, and assuming for the purpose of this inquiry only, without deciding either one way or the other, that a failure to comply with the provisions of this section would constitute such negligence on the part of a railroad corporation as would entitle the party injured, or in case he was killed, his administrator, to recover damages for the injury thereby sustained, let us inquire whether there was any evidence in this case of a failure on the part of the defendant company to comply with the provisions of this section of the General Statutes.

Counsel for appellant argues that "this provision involves *immediate* search for the injured person, and the burden of proof is thrown upon the company *to show extraordinary diligence* in using every resource at its command to succor the injured person." But to say nothing of the fact that we are unable to discover anything in the act throwing the burden of proof upon the railroad corporation, the provision necessarily involves the idea that the corporation knew, or at least ought to have known, that there has been an accident attended with injury to some person; for certainly one cannot be regarded as in fault for not giving notice of a fact which he neither knew nor ought to have known. Now, in this case there is no evidence that the company knew that there had been any accident attended with any injury to a person until the dead body was discovered, when everything seems to have been done by the employees of the company which the ordinary feelings of humanity would dictate.

But it is urged that the company was negligent in not instituting prompt and proper search for the body of deceased as soon as it was discovered that he was missing from the train. It will be remembered, however, that there was no evidence tending to induce a belief that any accident had occurred. The train had not run over an animal or other obstruction. It had not been thrown off the track. In fact, nothing whatever had occurred to

excite a suspicion that any one had been injured. According to the testimony, the train had gone down the grade and around the curves at Chaugee Hill in the usual way, with nothing to attract the attention of those who were in charge of it, as indicating that there was anything unusual; not even any evidence of any unusual jolting or swaying of the cars in going around those curves. Nothing whatever but the simple fact that it was eventually discovered that the deceased was not on the train; but at what precise point on the road this discovery was made, does not distinctly appear. For although he was missing from his proper place when the train reached Tacoa, it is very manifest that no one suspected then that he had been thrown, or fallen off, at Chaugee Hill, for the conductor at first supposed that he had been left at Westminster; but when informed by Jarrott that he had seen him after leaving that point, they evidently then concluded that he had gone forward to ride on the engine. But when the train reached Gainesville and the deceased could not be found on any part of the train, the conductor at once commenced making inquiries by telegraph to Tacoa, and perhaps other points, notifying the headquarters in Atlanta of his disappearance. These inquiries were repeated along the road upon the return trip and nothing was heard of him.

So that the inquiry is narrowed down to this: Ought the company to have known that the deceased had fallen or been thrown from the train, whereby he was injured or killed, simply because he was known to be on the train at Westminster, and was not on the train when it reached Gainesville, or whatever other subsequent point on the road it was discovered that he was missing from the train, in the absence of any evidence whatever that anything had occurred to the train in the interval between those points calculated to induce a belief that a person had been thrown from the train? The fact that an employee of a railroad company is known to be on the train at a certain point and is missing from the train at a subsequent point many miles distant, is certainly not sufficient to affect the company with knowledge of the fact that such person was either killed or injured by an accident on the road between those two points, especially when there is no evidence whatever that any accident

had occurred to the train in the interval between such points, and, on the contrary, the evidence shows that the train ran as usual between those points, with nothing exceptional or peculiar to attract the attention of those charged with the management of the train. The absence of a person under such circumstances might, and most naturally would, be accounted for in some other way than by supposing that he had been injured.

But, in addition to this the testimony, in our judgment, adduced by the plaintiff himself, so far from tending to show that there was any undue delay in prosecuting the search for the body of the deceased, shows the contrary. The deceased went out on the train which left Charlotte about 9 o'clock in the evening of January 9, and the evidence shows that the disaster which cost him his life occurred in the early hours of the morning of the 10th— between 12 o'clock and daylight. In addition to the inquiries made by the conductor by telegraph that night, or rather morning, inquiries were made along the road on the return trip of the train on the evening of the 10th, and the testimony of the plaintiff's witness, Mason, tends to show that the body was found some time during that day ; for after saying that he had sold a suit of clothes to one Williams, an agent of the railway company, as a burial suit for Oliver Adkins, which was paid for by the company, he says: "The said suit was sold on January 10, 1884, I think, and charged, by order of L. S. Williams, to Richmond & Danville R. R. Company on January 12, 1884." Again he says: "I saw the dead body at 104 mile post on the morning of January 10, 1884, I think," and then goes on to speak of seeing Williams and the other employees dressing the body in the new suit of clothes.

The only testimony tending to show that the dead body was not found until the 15th (if, indeed, it be such), as contended for by counsel for appellant, is that of Kennedy, the brother-in-law of deceased, who says: "I think the dead body of Adkins was returned to Charlotte on January 15, 1884." This, besides being indefinite, is entirely inconsistent with the testimony of Mason, the merchant who sold the clothes, and who was asked to speak from his books, and who said distinctly that the clothes were charged to the company on the 12th, though they may have

been actually purchased on the 10th. So that we think it clear that the Circuit Judge was fully justified in assuming that the body was found, at least, as early as the 12th; for it is hardly possible that a suit of clothes in which to array the dead body for burial would have been bought before the body was found.

The case of *Northern Cent. R. R. Company* v. *State* (29 *Md.*, 420), to which our attention was especially invited by counsel for appellant, differs from the one under consideration in this material respect. There the fact was clearly shown that the company had full knowledge that the deceased had received serious injuries by its train, which proved to be mortal, notwithstanding which he was locked up in a building at the station and left all night without any attention whatever, either medical or otherwise.

So that even if it was possible to assume, which it would be difficult to do upon the very slender testimony presented in this case. that the deceased was not killed by the fall from the train, but only injured, and that he crawled from the spot where he fell to the point where his body was found, and was there frozen to death, and that with timely aid, which it was the duty of the railway company to render, his life might have been saved, still, in the absence of any evidence that the company knew, or ought to have known, that he had been injured, it would be impossible to hold the company liable for not rendering aid not known to be needed.

The judgment of this court is, that the judgment of the Circuit Court be affirmed.